

Cite as 2016 Ark. App. 180

# ARKANSAS COURT OF APPEALS

DIVISION IV
№. CR-15-695

| | |
|---|---|
| JOHN DOUGLAS FLEMISTER<br>APPELLANT<br><br>V.<br><br>STATE OF ARKANSAS<br>APPELLEE | Opinion Delivered March 30, 2016<br><br>APPEAL FROM THE DREW COUNTY CIRCUIT COURT<br>[NO. CR-14-59]<br><br>HONORABLE DON GLOVER, JUDGE<br><br>AFFIRMED |

## BART F. VIRDEN, Judge

A Drew County jury convicted appellant John Douglas Flemister of twelve counts of theft of property, for which he was placed on twelve years' probation and was ordered to pay $23,400 in restitution. Appellant argues on appeal that the trial court erred in denying his motions for a directed verdict. We affirm his convictions.

### I. *Theft of Property*

The relevant subsection of the theft statute on which appellant was tried provides that a person commits theft of property if he knowingly obtains the property of another person by deception with the purpose of depriving the owner of the property. Ark. Code Ann. § 5-36-103(a)(2) (Repl. 2013). "Deception" means, among other things, (i) creating or reinforcing a false impression of fact, law, value, or intention or other state of mind that the actor does not believe to be true, (ii) preventing another person from acquiring information that would affect his or her judgment of a transaction, . . . or (v) employing any other scheme

to defraud. Ark. Code Ann. § 5-36-101(4)(A). "As to a person's intention to perform a promise, 'deception' shall not be inferred solely from the fact that the person did not subsequently perform the promise." Ark. Code Ann. § 5-36-101(4)(B). A person acts knowingly with respect to (A) the person's conduct or the attendant circumstances when he is aware that his conduct is of that nature or that the attendant circumstances exist, or (B) a result of the person's conduct when he is aware that it is practically certain that his conduct will cause the result. Ark. Code Ann. § 5-2-202(2). A person acts purposely with respect to his conduct or a result of his conduct when it is the person's conscious object to engage in conduct of that nature or to cause the result. Ark. Code Ann. § 5-2-202(1).

## II. *Trial Testimony*

The evidence shows that appellant was a partner with his uncle, Larry Flemister, in F & F Custom Boats, LLC, which was started in 1978 by appellant's father, Bobby Jack Flemister. Bobby Jack retired in 2012 due to health reasons, and appellant took over his father's unfilled orders for boats. Also, in January 2013, Larry began caring for his son, who was diagnosed with cancer and died in late November 2013. During that time, Larry did not take any orders for boats. Larry described F & F Custom Boats as having been "a one-man operation" until his return in early 2014.

According to Larry, the person who took an order was responsible for getting that boat built. Larry testified that he and appellant each had a crew of two men and that they often helped each other in building the boats. Appellant stated that, although Larry did not take any orders, he was still working on boats. The record, however, is not clear whether

SLIP OPINION

Larry's crew continued to work in his absence. Bobby Jack testified, "[W]e didn't have no whole bunch of labor to help us." He further testified to times when "three or four of [the laborers] laid out." Larry acknowledged that there is only one man currently helping them build boats.

Bobby Jack testified that, depending on materials and labor, a boat could be built in thirty to forty-five days. Larry stated that, depending on the type of boat and its size, a boat could be built anywhere from two to eight weeks. According to appellant, depending on the size, some boats could be built in four or five days, while others could take from four to five weeks. In explaining why it could take a year or longer to build a boat, appellant said that having other boats to build first would slow down the construction process. Yet, appellant claimed that, when taking boat orders, he "had no idea of the problems we were going to face" in producing the boats.

Larry testified that appellant controlled the money. According to Larry, appellant used boat deposits to buy cashier's checks to pay for materials, and labor and utilities were paid from final payments on finished boats. Appellant stated, however, that he sometimes paid for labor using the boat deposits. Larry admitted that, aside from the invoices, no financial records were kept for F & F Custom Boats because "as fast as [the money] comes in[,] it's gone." Larry conceded that it was possible that one customer's deposit actually helped pay for another person's boat, which he likened to "robbing from Peter to pay Paul."

Harry Gray testified that he ordered a boat from appellant on March 4, 2013, paid a $2,000 deposit, and was told that it would be finished in about six weeks. When the boat was

supposed to be finished, Gray called appellant repeatedly almost every day for two months. On one occasion, someone answered the phone, and Gray was told that appellant would call back in a few minutes. Gray did not receive that return call. On September 17, 2013, Gray sent appellant a registered letter explaining that he desperately needed the boat for personal reasons and implored appellant to contact him. Gray heard nothing, although he had a receipt showing that the letter had been received by appellant. On November 5, 2013, Gray sent another registered letter requesting the return of his deposit. Gray, however, heard nothing from appellant.

James Langley ordered a boat from appellant on May 24, 2013, and paid him a $2,000 deposit. Langley was told that his boat would be finished in six weeks. After approximately twelve weeks with no word from appellant, Langley contacted appellant by phone and was told that his boat would be done in another two weeks. Two weeks passed, and, because Langley could not reach appellant by phone, he drove to appellant's business. Langley's boat was not even in the process of being built. Appellant explained that he was running behind but that the boat would be built after a few more weeks. When the boat had not been built within the latest-given time frame, Langley confronted appellant again at his business and asked for his deposit back. Appellant told him that he had already ordered the metal for Langley's boat, so Langley asked for a definite date on which the boat would be finished. Appellant gave him the date of November 8, 2014; however, the boat was not finished on that date. Langley bought a boat elsewhere and only wanted his money back from appellant. Langley agreed to accept a check for $1,800, instead of $2,000, but the check was returned

4

for insufficient funds.

Jason Wiegman testified that he ordered a boat from appellant in May 2013, paid a $2,000 deposit, and was told that the boat would be finished in eight weeks. Two weeks after the anticipated completion date, Wiegman attempted to contact appellant. When he finally reached him using someone else's phone, appellant explained the delay, saying that there had been a family illness. Weeks passed, and Wiegman heard nothing. Wiegman contacted appellant, again using someone else's phone, and appellant claimed that the delay was because a press had broken. Wiegman subsequently called appellant's phone, which disconnected after ringing so many times. Again using someone else's phone, Wiegman reached appellant, who said that he needed a few more weeks to finish the boat. Wiegman did not hear from appellant, and in June or July 2014, he stopped by appellant's business and asked for the return of his deposit. Appellant claimed that he had just ordered the material and promised that the boat would be ready in two weeks. Wiegman said that he just wanted his money back and that appellant had told him that he did not have the money to repay him.

Robert Doles ordered a boat from appellant on June 2, 2013, and paid a $1,600 deposit. He said that appellant initially did not give him a date by which the boat would be built. After three months had passed, Doles heard others speaking about appellant's business, got worried, and tried to contact appellant. Doles stated that appellant's phone had been disconnected but that he continued to attempt to contact him. After appellant's phone had been reconnected, Doles still could not reach appellant. Another month passed, and Doles drove two and one-half hours to see appellant at his business. Appellant said that he had

"people down in his family." When Doles said that he still wanted the boat, appellant said that it would take three days to get it built and that he would call Doles. Three months passed, and Doles heard nothing. When Doles finally reached someone at appellant's business, he was told that appellant had gone to the post office and would call as soon as he returned. Doles did not hear from appellant. Doles began calling appellant every ten minutes for two hours, and appellant finally picked up the phone and said, "You want your boat, don't you?" Appellant said that the boat would be built within two weeks. After three weeks had passed, Doles repeatedly called appellant who finally answered the phone and said that he needed three more days. Doles never spoke with appellant again.

Darren Graham testified that he ordered a boat from appellant in September 2013 and paid a $2,000 deposit. Graham told appellant that he wanted the boat before duck season, which is the third weekend in November. Appellant said that he would have it done long before that time. Graham began calling appellant just before the start of duck season. Appellant told him that he was still working on it and sent him a picture that purported to be Graham's boat. After duck season was over, Graham asked for his deposit back.

Brandon Snow ordered a boat from appellant on January 28, 2014, paid a $3,000 deposit, and was told that the boat would be completed in four to six weeks. After six weeks had passed, Snow said that "it became harder to get in touch with [appellant]." Snow said that he called appellant every day and sent him text messages asking why appellant would not respond. Finally, in June 2014, appellant sent Snow a picture that purported to be Snow's boat in the process of being built. When Snow went to appellant's business in mid–July 2014,

he discovered that appellant had not started building his boat. Appellant said that he would start building it that Monday and that it would be ready on the following Friday. Snow did not hear from appellant again.

Michael Williams ordered a boat from appellant on February 7, 2014, paid a $2,500 deposit, and was told that the boat would be done in six to eight weeks. After six weeks had passed, appellant said that the boat would be finished in two more weeks. Williams finally reached appellant in June 2014, and appellant said that he had been dealing with some medical issues related to his father. Appellant told Williams to call back the following Wednesday. They agreed on July 14, 2014, as the completion date for Williams's boat. On that date, appellant said that he needed another week to finish. After that, Williams told appellant that he could not take any more days off at work and that he just wanted his money back. Williams did not hear from appellant again.

Deon Roop ordered a boat from appellant on January 24, 2014, and paid a $2,500 deposit. Appellant told Roop that if he sent the money the following day, he would give him free seats and said that he could order the metal right away for Roop's boat, which he said would be built in eight weeks. In February, Roop took a motor and trailer to appellant's business in preparation for the completion of the boat. Roop attempted to contact appellant multiple times but could not reach appellant. Roop tried calling from a different telephone number, and appellant answered and said that the boat would be ready the following week. In late June 2014, Roop went to appellant's business and was told that appellant, who was not there, had "legal issues." Roop later told appellant that he wanted either the boat, the

metal, or the money, and appellant said that the boat would be done in two weeks. During that time, Roop asked for a picture of his boat. Roop testified that appellant sent a picture of a hull, but that it was too small and not the tunnel hull he had ordered. Appellant did not contact Roop again.

Mary McMahan and her husband Samuel ordered a boat from appellant in January 2014. In early February, they went to appellant's business and were told that the sooner they paid their $1,500 deposit, the sooner appellant could order the metal and start building the boat. The McMahans were told that the boat would be built in six to eight weeks. After six weeks, the McMahans contacted appellant and were told that he needed two more weeks. Each time they called, appellant would extend the completion date by another two weeks. Appellant was supposed to call them in late May 2014, but they did not hear from him. Mary said that she started calling appellant "every fifteen or twenty minutes and called about forty times." Appellant did not answer the phone. In June 2014, the McMahans went to appellant's business and were told that the boat would be ready in one more week. In July 2014, the McMahans asked for their money back. Mary testified that, although appellant agreed to refund their deposit, he did not.

Todd Wisecarver testified that he ordered a boat from appellant on January 6, 2014, paid a $3,300 deposit, and was told that the boat would be ready in three months. Wisecarver built a trailer and took it to appellant's business. After four months had passed since the boat had been ordered, Wisecarver attempted unsuccessfully to contact appellant. Wisecarver showed up at appellant's business and was told that the construction on his boat would begin

SLIP OPINION

the following week. In late August, Wisecarver went to the prosecuting attorney about the matter. Wisecarver also contacted appellant's attorney, who was told by appellant that he would start building the boat that Thursday. In October 2014, Wisecarver asked for his money back but did not hear from appellant.

"Bo" Echols, a customer of F & F Custom Boats for twenty-five years, ordered what would have been his fifth boat from appellant on April 11, 2014. He paid a $3,000 deposit and was told that the boat would be done in four to six weeks. Echols began calling appellant after six weeks but did not reach him until he called from a different phone. Appellant told him that he was running behind and that there were a couple of boats ahead of his to be built. Echols "tried endlessly to get a hold of [appellant]." He called appellant's office number, but it had been disconnected; he called appellant's cell phone, but the voice mail had not been set up; and appellant would not respond to text messages. When Echols reached appellant in late September 2014, he said to appellant, "You're going to stick me, aren't you?" which appellant denied. In October 2014, Echols reached appellant when he tried calling from a different phone and told him that he needed the boat before duck season. Appellant said that the boat would be finished in two weeks. In November 2014, Echols's attorney sent appellant a letter requesting the return of Echols's deposit. There was no response from appellant.

Jimmy D. Howell ordered a boat from appellant on June 11, 2014, paid a $2,000 deposit, and was told that the boat would be ready in "a month or so." Howell began calling appellant every day in August. He did not reach appellant until he called from a number with

a Florida area code. Appellant said that the metal for Howell's boat had not yet come in and that it would be a few more weeks before he could finish the boat. In late September 2014, Howell drove to appellant's business. Appellant said that, although the hull was in, the boat would not be finished for another two weeks. When Howell visited appellant at his business a second time, appellant claimed, contrary to his earlier statement, that the hull was not in yet. When the boat had not been completed by October 13, 2014, Howell asked appellant to return his deposit.

Investigator Larry McMahen with the Arkansas State Police testified that he was assigned to appellant's case in November 2013 and received information from multiple victims. He stated that in December 2013 he went to F & F Custom Boats and spoke with appellant about his dissatisfied customers. According to McMahen, additional victims came forward after that interview. Also, Tim Nichols with the Drew County Sheriff's Office testified that he began getting complaints regarding F & F Custom Boats in 2012 and that he contacted appellant about those complaints. Nichols stated that, even after charges had been filed against appellant in April 2014, he continued to receive complaints about the business.

Appellant testified that F & F Custom Boats had produced seventy-nine boats in 2013 and fifty-one boats in 2014. According to appellant, the other boats would have been built if charges had not been filed against him and if his victims had not canceled their orders. Appellant insisted that he had never failed to build a boat or to return a customer's deposit but conceded that he might not have done so in the expected time frame.

SLIP OPINION

III. *Standard of Review*

A motion for a directed verdict is a challenge to the sufficiency of the evidence. *Durham v. State*, 320 Ark. 689, 899 S.W.2d 470 (1995). When a challenge is made to the sufficiency of the evidence on appeal, we will affirm the conviction if there is substantial evidence to support it. *McClellan v. State*, 2014 Ark. App. 725, 452 S.W.3d 16. In examining the evidence, we view it in the light most favorable to the State and consider only that evidence supporting the verdict. *Id*. Substantial evidence is evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id*. The fact that evidence is circumstantial does not render it insubstantial—the law makes no distinction between direct evidence of a fact and evidence of circumstances from which a fact may be inferred. *Hardcastle v. State*, 25 Ark. App. 157, 755 S.W.2d 228 (1988).

IV. *Argument*

Appellant argues that, due to family circumstances, F & F Custom Boats' cash–flow problems became insurmountable, resulting in his becoming indebted for the amounts of deposits placed on canceled boat orders. He says, however, "a financial inability to refund money paid down on a subsequently cancelled contract is a debt; it is not a withholding of property and does not fit the definition of 'deprive' in ACA § 5-36-101(4)."[1] Appellant also

---

[1] Arkansas Code Annotated section 5-36-101(4) provides that "deprive" means to (A) withhold property or to cause it to be withheld either permanently or under circumstances such that a major portion of its economic value, use, or benefit is appropriated to the actor or lost to the owner, [or] . . . (C) dispose of property or use it or transfer any interest in it under circumstances that make its restoration unlikely.

11

states in his brief that "in an effort to keep up with the demand for his high quality craftsmanship, the Appellant—who by no means was a businessman—simply became far overbooked and could not fulfill his commitments. That does not constitute deception." He asserts that there was no evidence that he intended to keep a deposit without building a boat and, however careless or reckless he may have been, it was not his conscious object to keep the money without building a boat. He states that "one of the primary causes behind [his] criminal prosecution . . . was his failure to properly communicate with his customers . . . and his seemingly dishonest and deceptive conduct in his attempts to pacify them by having them believe their boat was under construction when it actually wasn't." He argues that no property was obtained by *that* deception. Appellant asserts that property (a deposit on a boat to be built in the future) cannot be obtained by subsequent deceptive practices and that misrepresentations relating solely to the future are insufficient to support his convictions. Appellant maintains that there was no evidence that his customers "either paid their deposits because they were told the boat would be finished and delivered within the promised time frame or that the deposit for materials needed for the boat ordered would not be used to pay overhead and materials on other boats on order."

## V. *Discussion*

A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime, and because intent cannot be proved by direct evidence, the jurors are allowed to draw on their common knowledge and experience to infer it from the circumstances. *Davis v. State*, 2009 Ark. 478,

348 S.W.3d 553. Because of the difficulty in ascertaining a defendant's intent or state of mind, a presumption exists that a person intends the natural and probable consequences of his acts. *Id.* The trier of fact is not required to believe the testimony of a criminal defendant, who is the person most interested in the outcome of the proceeding. *Zones v. State*, 287 Ark. 483, 702 S.W.2d 1 (1985). In *Kerby v. State*, 233 Ark. 8, 342 S.W.2d 412 (1961), our supreme court, in affirming the appellant's conviction for obtaining money by false pretenses in the sale of corporate stock, noted that misrepresentations about matters relating solely to the future, e.g., a statement that the stock would increase in value within a year, were relevant because the evidence assisted the jury in understanding all the circumstances. The supreme court found sufficient evidence of misrepresentations about existing facts to support his conviction but, quoting *Baker v. State*, 4 Ark. 56, 62 (1842), wrote, "All the authorities concur, that the intention and design of the party are best explained by a complete view of every part of his conduct at the time, and not merely from the proof of a single and isolated act or declaration."

Appellant relies on three cases for the proposition that deception cannot be inferred solely from the fact that a person did not subsequently perform a promise, which he maintains is the sole fact here. In *Wiley v. State*, 268 Ark. 552, 594 S.W.2d 57 (1980), the appellant told the owner of a lumber company that he wished to buy lumber and materials on credit to build a house on land willed to him by his grandfather. When the lumber company did not receive payment as promised, the owner went to the land the appellant had referenced on the credit application and saw no construction underway and no materials on

site. Our supreme court held that there was insufficient evidence to support a theft-by-deception conviction because deception could not be inferred from the appellant's mere failure to perform a promise, which was to build a house. Moreover, the court pointed out that there was no evidence that the appellant made any false or deceptive representations. In *Cates v. State*, 267 Ark. 726, 589 S.W.2d 598 (1979), the appellant withdrew funds from an escrow account to discharge liens and then converted the money to his own use. The conviction for theft by deception was reversed by our supreme court because the trial court had improperly inferred deception from the appellant's subsequent failure to pay off the liens. In *Cox-Hilstrom v. State*, 58 Ark. App. 109, 948 S.W.2d 409 (1997), the appellant's theft-by-deception conviction was reversed by this court because the only unfavorable evidence was the appellant's admitted failure to pay the balance on a newspaper-ad account in the name of the owner of a business being leased by the appellant. Those cases, however, are distinguishable in that the *only* evidence of deception was the failure to perform a promise.[2]

Here, there was evidence of deception aside from appellant's failure to perform a promise.[3] The jury could infer from these circumstances that, at the time that appellant accepted boat deposits from the victims, he was well aware of the lack of manpower at F & F Custom Boats. Appellant was charged with filling orders taken by Bobby Jack before he

---

[2]We agree with the State that the facts of this case are similar to those in *Williams v. State*, 2009 Ark. App. 848; however, that case involved theft by exercising unauthorized control over the property of another, not theft by deception.

[3]Appellant referred to all counts in his directed-verdict motions but did not address each count individually. In reviewing the sufficiency of the evidence, this court will do likewise.



retired and took virtually all of the orders over the course of a year while Larry was with his son. It was not possible for "a one-man operation" to build boats in the time frames represented by appellant. Appellant had been in the business for approximately thirty-five years and knew or should have known that unfilled orders and working short handed would slow the construction process considerably. Appellant was aware of the increasing number of complaints against his business and avoided his victims because he knew that they likely wanted answers regarding their long-overdue orders. In spite of this, appellant continued to accept deposits for boat orders. Further, the jury could infer that, in readily answering calls from unknown numbers, appellant seemed eager to take on new business without regard for the unfilled orders of his victims. The jury could further conclude that appellant purposely deprived the victims of their property, ostensibly in order to satisfy and fund the demands of other customers in an effort to keep his business afloat. Appellant deprived the victims of their property in that he disposed of the deposits as he saw fit instead of buying materials for each customer's boat, and, when his victims asked for the return of their deposits, he did not have the money to give them. *See, e.g.*, *Hardcastle*, *supra* (affirming the appellant's theft-by-deception conviction and noting that investors were deprived of the use and benefit of their property when the appellant did not use the funds he received for the purposes represented to them). The jury was not required to believe appellant's explanation that he simply became overwhelmed with orders and got himself in "an unexpected crunch"; rather, the jury could have concluded from this evidence that appellant exhibited a pattern of deceit and engaged in a scheme to defraud. Viewing the evidence in the light most favorable to the jury's



verdict, we hold that there was substantial evidence to support appellant's convictions.

Affirmed.

GLADWIN, C.J., and GRUBER, J., agree.

*John F. Gibson, Jr.*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Adam Jackson*, Ass't Att'y Gen., for appellee.